UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,              :
        Plaintiff,                     :
                                       :     Case No. 3:06cr283 (JBA)
v.                                     :
                                       :
JOSE LOPEZ,                            :
        Defendant.                     :

RULING ON DEFENDANT'S MOTIONS TO SUPPRESS [DOCS. ## 18, 20, 31]

        Defendant Jose Lopez was arrested by the Stratford,

Connecticut police in the early hours of March 28, 2006 and

thereafter federally indicted on one count of possession of

ammunition by a convicted felon in violation of 18 U.S.C. §

922(g)(1) and 924(e).  On March 28 and 29, 2007, an evidentiary

hearing was held on defendant's Motions to Suppress statements

and physical evidence derived from the stop of the car in which

plaintiff was a passenger on March 28, 2006.  The parties'

briefing was concluded May 25, 2007.  For the reasons that

follow, defendant's Motion to Suppress all evidence [Doc. # 20],

Motion to Suppress cocaine evidence [Doc. # 31], and Motion to

Suppress Statements [Doc. # 18] will be DENIED.

I.    Factual Background

        Shortly after 2 a.m. on March 28, 2006, Stratford Police

Lieutenant Alan Wilcoxson was driving northbound on Success

Avenue in Bridgeport, Connecticut, a troubled neighborhood, when

he saw a black Jeep Cherokee traveling southbound on the same street.  Both vehicles were traveling approximately 25 to 30 mph. (Id. at 105-06.)  Wilcoxson noticed that the Jeep did not have a front license plate, and once he passed it, Wilcoxson saw in his rearview mirror what appeared to be a temporary license plate hung in the lower left corner of the rear window of the Jeep, but it was unilluminated and he could not make it out in the dark. (Hrg. Tr. at 16, 19, 136.)[1]

Because Wilcoxson could not read the temporary plate that night, he reversed direction in his police cruiser to follow the Jeep, which thereafter appeared to speed up and then made a rapid right-hand turn, "almost like an unplanned event," onto Gary Street.  (Id. at 23-25.)  Almost immediately, the Jeep pulled into a private driveway at a darkened house at 69 Gary Street and turned off its headlights, but no one got out of the vehicle. Wilcoxson followed the Jeep into the driveway, "blocking the exit

---

[1] Wilcoxson remembered having seen what he believed to be this Jeep with its temporary plate in its rear window earlier that evening at the Honeyspot Inn, an infamous location for a variety of criminal activities.  (Id. at 20.)  At the Honeyspot, he saw that the expiration date on the temporary plate was obscured by the black tinted border of the Jeep's rear window.  As the vehicle was unoccupied at the time, he did not examine it further or run the plate number.  (Id. at 21, 112.)  Luz Pagan, the driver of the Jeep, denied that she was at the Honeyspot earlier that day and testified that although she visited people at the Honeyspot occasionally, she never visited the Inn in her Jeep. (Id. at 256.)

to the vehicle so it couldn't back out." (Id. at 26.)  When no
one exited the Jeep to enter the house after about 12 seconds,
Wilcoxson used his police radio to give his location and
activated the strobe lights.  (Id. at 28.)  After leaving his
cruiser, Wilcoxson shined his flashlight on the temporary plate
in the Jeep's rear window and noted that "it was an expired
Connecticut DMV-type temporary plate" of some sort.  (Id. at 31,
115-16.)  While he could read the large numbers and letters
constituting the license number, the red numerals designating the
registration expiration date were obscured, although he made out
enough to determine that it was expired.  (Id. at 143.)  He
approached the driver's side window of the Jeep to speak to the
driver Luz Pagan.  When she rolled down her window, he smelled
marijuana and Pagan knew her registration had expired and
admitted that she was not carrying her driver's license.  When
asked whose house she was visiting, Pagan replied that she was
visiting her friend "Sarah" but knew neither Sarah's last name
nor the address or street of the house at which she had parked.
(Id. at 34.)  Suspicious of Pagan's story, Wilcoxson ran the
plates of the minivan parked in the driveway and after getting
the owner's last name, asked Pagan whether this was Sarah's last
name, which Pagan eventually admitted to making up Sarah,
"figur[ing] maybe if I told him I knew the person . . . I could

3

leave my car there so it wouldn't get towed."  (Id. at 244.)
Around this time, Officer Susan Koval arrived, asked Pagan to
step out of the vehicle, and patted her down toward the back of
the vehicle.  (Id. at 35-36, 47, 245.)

Since the Jeep was unregistered and was parked in a private
driveway, Wilcoxson knew that it would have to be towed in
accordance with Stratford Police Department's policy, which would
first require an inventory check of the vehicle's contents.  (Id.
at 38-39.)  To this end, he planned to have the vehicle's
occupants exit one-by-one to be patted-down "to make sure there
is no weapons or issues going on."  (Id. at 42-43, 46.)  Besides
Pagan, there were three other occupants in the Jeep: defendant
Jose Lopez in the passenger's seat; and a man and a woman in the
back seat.  (Id. at 84.)

When Wilcoxson was speaking with Pagan, he watched defendant
"shifting his weight back and forth, left and right several
times," repeatedly "craning his neck or turning all the way
around to see what was going on at the back of the car" and
"appear[ing] . . . nervous . . . making furtive movements."  (Id.
at 47.)  Pagan testified that she saw Lopez "moving sideways in
the seat and around the seat."  (Id. at 246-47.)  Wilcoxson
testified that he found Lopez's movements suspicious because
"[m]ost people, through my training and experience over 14 years,

4

when you pull them over, . . . tend to sit relatively still," as did the back-seat passengers on this occasion.  (Id. at 163.) Leaving Pagan with Officer Koval, and after Officer Lenny Rosati arrived, Wilcoxson walked to the passenger's side of the vehicle, where Lopez willingly rolled down his window, and Wilcoxson said something to the effect of: "I'm going to need you to come out, we're going to have to go through an inventory of the car, it's no big deal, we should have you along your way in a couple of minutes."  (Id. at 51.)  At that time, Wilcoxson saw a 14- to 15-inch "hard-type object wrapped up in a denim jacket" deliberately held with fingers under and thumbs on top, which Wilcoxson suspected could have been a weapon and could "have been rebar, or something . . . like a pipe."  (Id. at 52.)  Because it was typical to find weapons in a car in the passenger compartment, Wilcoxson was "on alert" and "very suspicious of the object," which was haphazardly wrapped in the jacket.[2]  Wilcoxson asked Lopez, still seated, "What's in the jacket?" to which defendant responded, "It's a beer bottle."  (Id. at 55, 58.)  Because there was another beer bottle clearly visible on the center console of the vehicle, Wilcoxson disbelieved defendant's statement.  (Id. at 57.)

---

[2] Pagan later acknowledged the jacket as hers, which she had earlier thrown into the back seat, perhaps explaining defendant's observed movements as his retrieving her jacket to wrap the gun.

Before exiting the vehicle, Lopez placed the package on the
floor between his ankles, left the door open, and stepped toward
the rear of the vehicle.  (Id. at 59, 60.)  Wilcoxson's supsicion
that something was amiss in the car was heightened by defendant's
leaving the car door open.  Wilcoxson told defendant, "I'm just
going to pat you down real quick," but that "[b]efore [Wilcoxson]
placed [his] right hand on [defendant] to start the part-down, .
. . [defendant] attempted to get back into the vehicle."  (Id. at
60, 61.)  Wilcoxson "asked him, 'What the f--- are you doing?'
And . . . pulled him right back," ordering him not to move his
hands again.  (Id. at 185.)  The officer resumed frisking Lopez
for weapons.  (Id. at 69.)  As he slid his hand across Lopez's
belt-line watch-pocket, he determined there were no small
weapons, such as razor blades.  (Id. at 189-90.)  However, he
"felt a large bulge in that pocket, and whatever was inside felt
kind of, . . . pebbly;" "It was immediately apparently through my
training and experience to be [sic] crack cocaine."  (Id. at 71,
190.)  As he came across what he believed to be crack in the
pocket, Wilcoxson asked "What's in the pocket?" to which
defendant replied, "It's personal use, man."  (Id. at 71, 72.)
Following defendant's statement confirming his suspicions,
Wilcoxson removed from Lopez's pocket "a plastic baggy containing
several,  . . . smaller baggies containing rock cocaine."  (Id.

at 75.)

Lopez was then placed in handcuffs, seated in Rosati's cruiser, and advised he was under arrest, though no <u>Miranda</u> warning was administered. (<u>Id.</u> at 76, 195.) Wilcoxson then returned to the open Jeep door and found a loaded .44 old-style Remington six-shooter, and as he took it over to Rosati at his cruiser, he asked Lopez, "What's up with this?" meaning the gun; Lopez replied, "I don't know. I don't know nothing." (<u>Id.</u> at 77, 80, 81.)

The Jeep inventory also revealed brass knuckles, an open bottle of beer on the center console, and marijuana blunt residue in an ashtray. (<u>Id.</u> at 82-83.) Numerous criminal charges were filed against Lopez and Pagan, although Pagan was not charged with any traffic violations, such as an improperly displayed license plate, driving without a license, or driving an unregistered vehicle. (<u>Id.</u> at 88-90.) No charges were filed against the other two passengers, who were patted down and then permitted to leave. (<u>Id.</u> at 83.)

## II. Discussion

### A.  Reasonableness of the Stop (Fourth Amendment) [Doc. # 20]

Defendant Lopez argues that Officer Wilcoxson lacked probable cause to pull over Pagan's jeep in the first place and thus that all observations made, evidence seized, and statements

given are illegal fruits of the poisonous tree that should be suppressed under the Fourth Amendment. The government argues that Wilcoxson's traffic stop for improper license plate display is assessed as a Terry stop[3] and here was based on reasonable suspicion that the Jeep operator was violating the state motor vehicle law governing display of license plates, Conn. Gen. Stat. § 14-18.[4]

---

[3] See <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

[4] The statute provides in relevant part:

(a)(1) Each motor vehicle for which one number plate has been issued shall, while in use or operation upon any public highway, display in a conspicuous place at the rear of such vehicle the number plate. Each such motor vehicle shall also display a sticker on the number plate or elsewhere on the vehicle, as the commissioner may direct, denoting the expiration date of the registration. Such sticker may contain the corresponding letters and numbers of the registration and number plate, as assigned by the commissioner.
. . .
(c) Such number plates when displayed upon motor vehicles shall be entirely unobscured and the numerals and letters thereon shall be plainly legible at all times. Such number plates shall be horizontal, and shall be fastened so as not to swing and, during the time when a motor vehicle is required to display lights, the rear number plate shall be so illuminated as to be legible at a distance of fifty feet. . . . If any number plate supplied by the commissioner is lost, or if the registered number thereon becomes mutilated or illegible, the owner of or the person in control of the motor vehicle for which such number plate was furnished shall immediately place a temporary number plate bearing said registration number upon such motor vehicle, which temporary number plate shall conform to the regular number plate and shall be displayed as nearly as possible as herein provided for such regular number plate . . .

"Under Terry v. Ohio, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot."  United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007).  "A Terry stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest."  Id. (citing Adams v. Williams, 407 U.S. 143, 145-46 (1972)).[5]  "[A] police officer who observes a traffic violation may stop a car without regard to what a 'reasonable officer' would do under the circumstances and without regard to the officer's own subjective intent."  United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1998)(citing Whren, 517 U.S. at 813, 815-19).  In other words,

---

Conn. Gen. Stat. § 14-18.

    While the parties have briefed the issue of whether Pagan's alleged failure to signal while turning onto Gary Street was a basis for Wilcoxson's stop of the vehicle, because Wilcoxson testified that his sole reason for stopping the Jeep was the suspected license display/illumination violation, the Court need not address the arguments related to Pagan's use of a turn signal.

[5] See also Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); Delaware v. Prouse, 440 U.S. 648, 663 (1979) ("Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile . . . [is] unreasonable under the Fourth Amendment.").

whether an officer uses an observed traffic violation as a
pretext to stop a car is irrelevant to application of an
objective standard for reasonableness.  See id.  After lawfully
stopping a car, a police officer may "as a matter of course"
order the driver and passengers to exit the vehicle.  See Md. v.
Wilson, 519 U.S. 408 (1997); Penn. v. Mimms, 434 U.S. 106 (1977).

    The statute governing display of license plates, Conn. Gen.
Stat. § 14-18, requires that vehicles for which one number plate
has been issued must, during use on a public highway, "display in
a conspicuous place at the rear of such vehicle the number
plate;" must display a sticker denoting expiration on the plate
or elsewhere on the vehicle "as the commissioner may direct;"[6]
such displayed number plates must be "entirely unobscured and the
numbers and letters thereon shall be plainly legible at all
times;" and "during the time when a motor vehicle is required to
display lights, the rear number plate shall be so illuminated as
to be legible at a distance of fifty feet."  Conn. Gen. Stat. §
14-18(c).  Further, the statute dictates that even temporary
number plates replacing lost, mutilated, or illegible
commissioner-issued plates "shall conform to the regular number
plate and shall be displayed as nearly as possible as herein
provided for such regular number plate."  Id.

---

[6] See discussion, infra, at 12.

10

Counsel agree that when Wilcoxson stopped his car behind the Jeep, the vehicle was "seized."[7] According to Wilcoxson, the "plate [was] the focus of the stop, although, I mean, they stopped on their own. The focus is, there is a plate in the rear window, I can't read it, it's not illuminated, and it looks to all my indications to be the identical vehicle I had seen just earlier at the Honeyspot." (Hrg. Tr. at 211.) He testified that he intended to stop the car before it pulled into the Gary Street driveway "because [he] couldn't read the plate and it did not have a light." (Id. at 212.)

Defendant argues that Pagan's plate was displayed in accordance with § 14-18, as placing the paper plate in the exterior position reserved for metal plates would lead to tearing or fading or render it vulnerable to theft. With respect to illumination, defendant argues that illumination is not required and/or feasible for a paper plate such as Pagan's and that in any case Wilcoxson was never close enough to the Jeep to determine whether or not the plate was illuminated. The government maintains that Wilcoxson had an opportunity to see the inadequately displayed, unilluminated plate while driving at night behind the Jeep, giving him reasonable suspicion to stop

_____

[7] Although not an issue here, it is now clear that both driver and passengers were also "seized" at this point for Fourth Amendment purposes. See Brendlin v. Calif., 127 S.Ct. 2400 (2007).

11

the Jeep for violation of plate display requirements. It also
points to the Jeep's DMV-issued paper plate's four corner-
mounting holes, facilitating attachment in the illuminated plate
bracket on the rear of the vehicle. Indeed, the "Important
Notice" on the back of the temporary plate instructs: "when a
vehicle is _required to display lights_, the rear plate shall be so
illuminated to be legible at a distance of 50 feet" (Plate, Hrg.
Ex. 2 (emphasis in original)).[8] Notwithstanding defendant's
computation that Wilcoxson was 147 feet from the rear of the Jeep
two seconds after the vehicles passed each other on Success
Avenue and his conclusion that therefore the officer could not
then have determined what was visible at the statutory 50-foot
position, after Pagan stopped of her own accord and Wilcoxson
pulled up behind her, he certainly was within 50 feet. Moreover,
in the dark of night, Wilcoxson could readily see that the plate
was not illuminated, which Pagan admitted (Hrg. Tr. at 252).
Further, Pagan testified that she taped the temporary plate in
the lower left corner of the rear window and that the 2-inch
black-tinted border around the window obscured some portion of
the bottom of the temporary plate, specifically the letters

---

[8] This Notice further instructs: "This temporary plate must be
attached to a vehicle in the same manner as attaching a permanent
plate. Such plates shall be _displayed in a conspicuous place_ at
the front and rear of such vehicles and the numerals and letters
shall be plainly legible at all times." (Plate, Hrg. Ex. 2
(emphasis in original).)

"CONN" along the left side of the plate and some portion of "Exp.
01 Mo. 13 Day 06 Yr.," which was printed in red along the bottom
of the plate.  (Id. at 300-03.)

No Connecticut cases address the illumination requirements
for temporary plates, but Conn. Gen. Stat. § 14-18, whose purpose
is obviously to improve nighttime visibility for law enforcement
and others who need to note a moving vehicle's unique
identification number, makes no exception.  Defendant offers no
reason why this purpose for illumination would be any less
applicable to temporary plates.  In United States v. Foster, the
Sixth Circuit, faced with a similar Kentucky statute,[9] concluded
that "the absence of a provision exempting temporary tags from
the general applicability of [the statute] supports the
proposition that they are subject to the same illumination
requirements as are permanent plates,"  65 Fed. Appx. 41, 44 (6th
Cir. 2003).

In two cases cited by defendant, United States v. Edgerton,
438 F.3d 1043 (10th Cir. 2006), and United States v. Ruiz-Lopez,
No. 05-40060-01-JAR, 2006 U.S. Dist. Lexis 25768 (D. Kan. Apr.

---

[9] The Kentucky statute provides in relevant part: "Plates shall
be kept legible at all times and the rear plate shall be
illuminated when being operated during the hours designated in
KRS 189.030. No rim, frame, or other covering around the plate
shall in any way obscure or cover any lettering or decal on the
plate."  Ky. Rev. Stat. § 186.170(1).  It makes no reference to
temporary plates.

26, 2006), officers lawfully stopped motorists driving at night
with temporary plates that the officers could not read.  In both
cases, the plates, although not clearly legible, turned out to be
valid, and the officers' authority to stop and detain ended upon
such determination of validity.  Here, Wilcoxson's investigative
stop was authorized because he could not read the temporary plate
at night, but his inspection demonstrated that the plate was
neither clearly visible nor valid.

This case is also distinguishable from United States v.
Wilson, 205 F.3d 720 (4th Cir. 2000), in which the Fourth Circuit
held that evidence of a gun seized from the defendant's car
during a traffic stop should have been suppressed, where the
officer admitted never seeing anything illegal about the plate or
operation of the car and only became suspicious of the vehicle
because of its out-of-state license plate.  Here, Wilcoxson
believed he recognized this Jeep with its temporary plate from a
prior sighting, and once behind the vehicle on Success Avenue,
had reasonable suspicion that Pagan had violated the statute
requiring the plate to be "entirely unobscured" and "plainly
legible at all times" because he could not read it, even as he
stopped behind it.  See, e.g., United States v. Hsuing, No. CR-
05-168-L, 2006 WL 118283 (W.D. Okla. Jan. 13, 2006) (denying
motion to suppress where defendant's vehicle was stopped for

improper display of license plate, as officer had reasonable suspicion of violation based on obstruction of bottom portion of license plate by license plate frame; United States v. Walton, No. 1:03-00014, 2004 WL 3460842 (M.D. Tenn. Nov. 12, 2004) (finding that probable cause existed to stop a car whose license plate was partially obscured by a license plate frame).

Thus, as Wilcoxson's stop of the vehicle was reasonable under the totality of the circumstances, and its scope was properly extended to encompass an inventory search, defendant's Motion to Suppress all evidence [Doc. # 20] is DENIED.

**B.    The Frisk and Scope Thereof (Fourth Amendment) [Doc. # 31]**

In defendant's Supplemental Motion to Suppress Evidence [Doc. # 31], he maintains that Wilcoxson's frisk was unsupported by a reasonable belief that he was armed and dangerous and, in the alternative, that any permissible pat-down went beyond what was necessary to determine whether he was armed and dangerous. The government responds that the circumstances of  hour of the night, Pagan's lie about visiting a friend's house, Lopez's nervous behavior, the marijuana odor, the open bottle of beer, the rigid object wrapped in the jacket on defendant's lap, about which he lied, and Lopez's attempt to reenter the car, all in combination, made Wilcoxson's frisk reasonable for self-protective purposes.

In the Second Circuit, to be lawful, Wilcoxson's frisk must meet two requirements:

> First, it cannot be motivated solely by a "hunch" that an individual is armed and dangerous. There must instead be a suspicion supported by "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." Second, the weapons search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

United States v. Casado, 303 F.3d 440, 444 (2d Cir. 2002) (citing Terry, 392 U.S. at 29). The search must be "limited in scope to [a] protective purpose," McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 1997) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)), and if the pat-down is lawful, then the "warrantless seizure [of contraband found in the course of the pat-down] would be justified by the same practical considerations that inhere in the plain-view context." Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993). Under this plain-feel rule, if an officer while conducting the pat-down finds what he or she believes from experience to be narcotics, "the pat-down gives [him or her] probable cause to search the suspect for drugs." United States v. Salazar, 945 F.2d 47, 51 (2d Cir. 1991) (affirming denial of motion to suppress where pat-down resulted in officer feeling "crackling plastic, which betrayed the presence of crack vials").

Prior to the pat-down, Wilcoxson had observed defendant's

"furtive" movements and was put "on alert" by defendant's awkward possession of a 14- to 15-inch concealed rigid object, which he suspected might be rebar or pipe (Hrg. Tr. at 52)--which could be used as a weapon and about which he disbelieved defendant's claim it was just a beer bottle, even though that, too, could be a weapon--and by defendant's movement back toward the open car door.  From these circumstances, Wilcoxson made specific reasonable inferences that Lopez might be otherwise armed and was thus justified in making a protective frisk.

As to the scope of the pat-down, Wilcoxson testified that he "pulled [his] hand across" defendant's watch-pocket and "felt a large bulge in [defendant's watch] pocket, and whatever was inside felt kind of, . . . pebbly," at which point he asked defendant, "'What's in the pocket?'" and defendant replied, "'It's personal use, man.'"  (Hrg. Tr. at 71.)  Wilcoxson testified that when he pressed his hand across the pocket and felt its contents, he knew it contained crack, even though, "when I felt the watch pocket, I made a determination that there were no weapons inside there" (id. at 189).  Wilcoxson denied that he "continued to feel around a little bit" (id. at 190) after determining that no weapons were in the pocket, only that: "I moved my hand from right to left, the items, they were inside of a plastic bag;" "when you slide your hand across horizontally,

the contents of his pocket moved from left to right" (id. at 72, 190).

Wilcoxson's pat-down simultaneously determined that the defendant was not armed and that he likely possessed contraband. His testimony that he moved his hand from right to left did not transform his pat-down into an intrusive "examin[ation] . . . with [his fingers]," see Dickerson, 508 U.S. at 369. Wilcoxson did not undertake the kind of action that warranted suppression in Dickerson, where the Supreme Court held that it would exceed the bounds of Terry to allow into evidence contraband identified as such "only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon," id. at 378. In this case, rather, the evidence is that Wilcoxson did no more than press his hand across defendant's watch-pocket area in search of weapons and thus did not exceed the scope of his justified protective frisk. See Salazar, 945 F.2d at 51 ("If the frisk for a weapon is conducted in compliance with proper standards and results in recognition of the likely presence of narcotics, 'it is immaterial that what was discovered is not the article for which the police officers were originally and specifically looking.'")

Finally, assuming arguendo, suppression of defendant's un-

Mirandized statement "it's personal use, man," its corroborative role in confirming Wilcoxson's belief that he was feeling crack during his pat-down does not require suppression of the discovered drugs, because the poisonous fruit doctrine is inapplicable under United States v. Patane, 542 U.S. 630, 636 (2004), given that Wilcoxson already had probable cause to search the pocket from the characteristics of what he felt in it. Defendant's Motion to Suppress the seized cocaine evidence [Doc. # 31] is DENIED.

### C.  Statements (Fifth Amendment) [Doc. # 18]

Defendant seeks to suppress three statements attributed to him in Wilcoxson's report:

(1)  "it's personal use man;"

(2)  "Lopez denied any knowledge of the pistol on his lap and stated he had no idea how the loaded pistol ended up on his lap or why he then placed it on the floor;" and

(3)  "I asked Lopez what was in the jacket and he stated that it was a beer bottle."

Under Miranda v. Arizona, 384 U.S. 436, 478 (1966), "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized," and as a prophylactic, the resulting statements are presumed to be coerced.

19

"Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). In Berkemer v. McCarty, 468 U.S. 420, 438 (1984), the Supreme Court observed that "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely:'" the presumptive temporariness of the stop, and the fact that such stops are usually out in the open, which makes the motorist feel not completely at the mercy of the police.

### 1.  Custody (first and third statements)

At the time defendant responded, "it's personal use man," to Wilcoxson's inquiry of "what was inside his pocket," defendant had been physically pulled back by Wilcoxson to the back of the Jeep and angrily ordered not to move his hands again until Wilcoxson finished, in which circumstances defendant argues that a reasonable person would not have felt free to leave.  The government responds that this interaction occurred in the context of a Terry stop and that a reasonable person in defendant's circumstances at the time he made his statement would have

understood that his freedom of action had not "been curtailed to a degree associated with formal arrest" and thus a <u>Miranda</u> warning was not required.

An individual is in custody when s/he receives the affirmatively conveyed message that s/he is not free to leave, and when inherently coercive measures are employed. <u>See</u> <u>United States v. Mitchell</u>, 966 F.2d 92 (2d Cir. 1992) (reversing grant of motions to suppress where defendants were questioned in their homes, were cooperative, remained calm, and freely answered questions). When defendant made the statement "it's personal use man," he was physically restrained by Wilcoxson; he was being frisked by Wilcoxson, who had "pulled" and "yanked" Lopez to the rear of the car and yelled, "What the f--- are you doing?" when he perceived Lopez trying to reenter the vehicle. (Hrg. Tr. at 184-85.) These factors indicate that Lopez was not free to leave when the statement was made, satisfying the first prong of <u>Mitchell</u>. However, the evidence does not show that Lopez was under "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." <u>See</u> <u>Mitchell</u>, 966 F.2d at 98 (quoting <u>United States v. Morales</u>, 834 F.2d 35, 38 (2d Cir. 1987)). Defendant made the utterance in response to Wilcoxson's question of what was inside his pocket-- no more force was employed to elicit this statement than was

already employed for purposes of the frisk.  As evidence is lacking to satisfy the second prong of <u>Mitchell</u>, defendant's Motion to Suppress with respect to "it's personal use, man" is DENIED.

Defendant's third reported statement, "he stated that it was a beer bottle," was made after the car was stopped, after defendant was directed to exit the Jeep and in response to Wilcoxson's question, "what was in the jacket."  Defendant argues that this occurred during custodial interrogation because the officer observed an odor of marijuana in the Jeep, Pagan had already admitted to lying about knowing the owner of the house whose driveway she had pulled into and admitted to not having her license, and the scene was a darkened residential street/driveway.  The government urges that these facts do not constitute being in custody because Lopez was not the driver of the car and could not have been arrested for traffic violations, because Wilcoxson never mentioned the smell of marijuana, and as the encounter was in the open.[10]

---

[10] Although <u>Brendlin</u> holds that passengers are "seized" during a <u>Terry</u> stop for Fourth Amendment purposes, this analysis is distinguishable from the question of "custody" in the Second Circuit:

> Because seizure is a necessary prerequisite to Miranda, . . . it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter

While the exchange with Wilcoxson took place late at night, several officers were present, and Pagan's car was blocked, when defendant made this statement, Wilcoxson had not touched him and had told him that the forthcoming frisk would be "no big deal" and would not last long.  Examining the totality of the circumstances, it is clear that defendant was not in "custody" and a <u>Miranda</u> warning was thus not required.

## 2.    Voluntariness (second statement)

Lopez's statement denying knowledge of the pistol was made after defendant's arrest and, because the statement was not Mirandized and is clearly inadmissible, the government has represented that it will not be offered in its case-in-chief, mooting this portion of defendant's motion.  The government argues, however, that it may be used for impeachment if defendant testifies--that because defendant had extensive prior experience with the criminal justice system and uttered his statements that he knew nothing about the gun during what Wilcoxson characterized as "a one-, two-sentence exchange" (Hrg. Tr. at 81), his

---

at issue. If the answer is yes, the Miranda inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as <u>Berkemer v. McCarty</u>, 468 U.S. at 439-40, instructs, not every seizure constitutes custody for purposes of Miranda.

<u>United States v. Newton</u>, 369 F.3d 659, 672 (2d Cir. 2004).

statements were made voluntarily.  Defendant argues that this
statement must be excluded for all purposes because it was
involuntarily uttered insofar as he "was under arrest, cuffed,
and placed in a police cruiser" at the time.  (Def. Post-Hrg.
Mem. [Doc. # 42] at 23.)

Under Patane, 542 U.S. at 639, supra, "statements taken
without Miranda warnings (though not actually compelled) can be
used to impeach a defendant's testimony at trial."  However, such
statements cannot be used even for impeachment purposes where the
police officer's conduct "was such to overbear [defendant's] will
to resist and bring about confessions not freely self-
determined," Rogers v. Richmond, 365 U.S. 534, 544 (1961).
Wilcoxson testified that he placed Lopez in the cruiser, gave the
gun to Officer Rosati and then asked Lopez, "What's up with
this?" to which Lopez responded, "I don't know.  I don't know
nothing."  According to Wilcoxson, Lopez "wasn't combative, he
wasn't argumentative, he just said, . . . I don't recall, . . .
it was nonspecific and he wasn't helpful, and you know, I didn't
ask him any further questions."  (Hrg. Tr. at 81.)  While
Wilcoxson's perception of Lopez as calm does not require the
conclusion that Lopez's statements were made "freely," it does
support an inference that defendant's extensive prior experience
with the criminal justice system may have been brought to bear in

his denial of any knowledge about the gun.  Wilcoxson had previously used some physical restraint on Lopez and Lopez was cuffed in Rosati's cruiser, but these circumstances alone are insufficient to show overbearing compulsion by law enforcement to elicit an involuntary statement.

For the  foregoing reasons, defendant's un-Mirandized statement denying knowledge of the gun will not be suppressed for impeachment purposes.  Defendant's Motion to Suppress this second statement is DENIED.

## III. Conclusion

Accordingly, defendant's Motion to Suppress all evidence [Doc. # 20], Motion to Suppress the cocaine evidence [Doc. # 31], and Motion to Suppress Statements [Doc. # 18] are DENIED.


IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 26th day of June, 2007.**